UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ELIZABETH GONZALEZ,

                            Plaintiff,

        -against-

ARAMARK FOOD AND SUPPORT SERVICES
GROUP INC., ARAMARK HEALTHCARE
SUPPORT SERVICES, LLC, and ARAMARK FOOD
SERVICE CORPORATION,

                            Defendants.
------------------------------------------------------------X

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
09-cv-4843 (CBA)

**AMON, Chief United States District Judge**.

## INTRODUCTION

Aramark, a food services contractor and the defendant in this New York state tort suit, moves for summary judgment against Plaintiff Elizabeth Gonzalez. Aramark claims that under New York state law it did not owe a tort duty to Gonzalez and that, even if it did, it did not breach that duty. Having reviewed the parties' submissions, the Court concludes that Aramark has failed to show that it is entitled to Summary Judgment.

## BACKGROUND

This suit arises from a trip-and-fall at Lutheran Hospital in Brooklyn, NY. Elizabeth Gonzalez was hired by Lutheran to be a food services worker in 1998. *Gonzalez Dep.* at 48. At the time, all food services functions were managed by the hospital in-house. *Davis Dep.* at 31-32. Sometime around 2002 Lutheran decided to make a change. It solicited bids from outside food services providers and eventually settled on Aramark to take over its food services department. *Id.* The contract between the parties authorized Aramark to

1

manage, on [the Hospital's] behalf, Hospital's Food Service Department on its premises in Brooklyn, New York and to supervise, on its behalf, the preparation and service of food, including therapeutic diets, for patients, staff, employees and authorized visitors. ARAMARK shall be the sole provider to the Hospital of such management services during the term of this Agreement. *Mot. exh. F* at 1.

The contract also addressed personnel. Aramark was to hire its own employees to supervise the food services department, but the remainder of the food services staff would be employed by Lutheran. *Id.* at 4-5. Gonzalez was among those Lutheran staff that remained assigned to the food services department when Aramark took over.

The food services operation at Lutheran has several interconnected units. Some employees work in the kitchen preparing food while others serve food in the cafeteria or on the floors with patients. The food that is served to patients begins in the kitchen and is then transported up to a pantry on the floor being served. Once it arrives, the food services employees distribute it to the patients one by one. Since this process can take a while at Lutheran, Aramark used a piece of equipment called a "Burlodge Cart" to keep the food at the proper temperature. The Burlodge Carts used at Lutheran from 2002 up to Gonzalez's accident were Multigen II models. *Belisle Dep.* at 9. The Multigen II features a refrigerator, an oven, and a heated gantry. *Id.* According to Myles Davis, Lutheran's Senior Vice President for Corporate Services, Aramark suggested the Burlodge Carts to Lutheran shortly after they took over food services. *Davis Dep.* at 10; 35-39. Lutheran then placed the order and purchased the carts. *Id.*

Burlodge Carts have a black, 6-foot-long, half-inch thick power cord. *Belisle Dep.* at 46; *Lee Dep.* at 22-25. As one might imagine, this cord could be a tripping hazard if extended across the path of someone walking by the cart. According to Susan Belisle, a clinical manager at Burlodge USA, Burlodge recommends that its carts be positioned so as to avoid this. *Belisle Dep.* at 40. Aramark was also aware of this potential hazard, so it brought in a Burlodge representative when

2

the carts were purchased in 2002 to train food services workers in their use, and it developed a policy that the Burlodge Cart was to be positioned by the door of the pantry and the cord plugged into the outlet just next to the door. Instead of positioning the cart in front of and across the doorway—leaving paths around the cart on either side, across one of which was the power cord—the cart was to be positioned on a diagonal with one edge of the cart against the side of the doorway—such that one could exit the pantry only to the side of the cart without the cord. *Id.* at 89-100.

Unfortunately, the cart was not positioned this way in Unit 4C/4D on the morning of January 3, 2009. That morning, not only was the cart not angled against the wall, but it was connected with an extension cord so that it could be moved further from the entrance of the pantry. *Davis Dep.* at 24-25. This created a wider path over which the cord lay. *Id.*

Gonzalez usually worked in the kitchen preparing food. According to Alicia Haynes, the Patient Services Manager employed by Aramark, this was because Gonzalez had "leg problems" which made it difficult for her to be a server. *Haynes Dep.* at 53-59. On the morning of January 3, however, a staff member on the team working in Unit 4C/4D failed to come to work. *Haynes Dep.* at 34-36. This left only two workers, Michael Brown and Yung Chi Lee, on the team. *Id.* at 35. When Haynes realized this, she sent Gonzalez up to help. *Id.* By the time Gonzalez arrived, Lee and Brown were almost finished, but they asked her to prepare hot water for tea in the pantry, which would then be brought to a "running truck" so Lee could bring it to patients. *Brown Dep.* at 53-56. Gonzalez came out of the pantry holding a cup of hot water in either hand. The running truck was parked to the left of the pantry, the side over which the Burlodge Cart's cord was extended. *Davis Dep.* at 30. As Gonzalez walked past the cart, her left foot hit the cord and she fell, breaking her left femur.

The above facts are largely undisputed, but the parties dispute many other facts underlying this action. First, the parties disagree about the nature and extent of the training provided to employees concerning the Burlodge Carts. Aramark, supported by Haynes's deposition, argues that direct instructions were given by one Herman Crawford on the proper way to position the cart. *Haynes Dep.* at 94-101. (It is unclear from Haynes's statement whether Crawford was an Aramark employee, though it appears he was.) Aramark also provided a sign-in sheet that indicates that Gonzalez was present at this training. *Mot.* exh. H. On the other hand, Brown, a fellow food services worker, testified in his deposition that Aramark often trains employees on the positioning of the cart, but that they instruct them to position it across the doorway instead of on a diagonal. *Brown Dep.* at 28-30; *see also Lee Dep.* at 34-35. Brown further testified that he had never received training on the use of an extension cord. *Id.*

Second, the parties dispute which entity, Aramark or Lutheran, was responsible for supervising food services and ensuring the safety of food services operations. Gonzalez submitted lengthy documentation of Aramark's safety policies, which are of course specific to food services. In Haynes's deposition, she acknowledged that she performed supervision rounds during each meal. *Haynes Dep.* at 25-26. She also claimed that she enforced Aramark's policy on the positioning of the Burlodge Carts. *Haynes Dep.* at 89. Moreover, it seems clear from the depositions of Gonzalez, Brown, and Lee that they see Aramark as their sole and direct supervisor. *Gonzalez Dep.* at 139-40; *Brown Dep.* at 27; 60-61; *Lee Dep.* at 24-25. Lutheran did, however, have a more generalized safety department, which inspected the Burlodge Carts when they were first purchased. *Delucia Dep.* at 11. Lutheran also had a safety officer, Bill Killips, who conducted rounds once a week with other supervisors. *Id.* at 16. Tripping hazards were one of the issues they would look for, but Lutheran had no part in the maintenance of the Carts and the po-

sitioning of Burlodge Carts was thought by Lutheran to be Aramark's responsibility. *Id.* at 12-14; 34.

Third, it is not clear from the deposition testimony exactly how frequently the Burlodge Cart is positioned as it was on January 3, 2009. Both Gonzalez and Brown contend that they have observed the cart improperly positioned on numerous occasions. *Gonzalez Dep.* at 97; *Brown Dep.* at 21-22. Fourth, the parties dispute whether employees had complained about a tripping hazard before that date. Haynes claimed that she had never received a complaint about a Burlodge Cart power cord. *Haynes Dep.* at 101. According to Brown, however, he complained about the cord to Aramark supervisors on more than one occasion, including once to Haynes. *Brown Dep.* at 27, 60-61.

Finally, the parties dispute who plugged the cord in that morning. *Opp.* at 20-21. Brown initially suggested during his deposition that Gonzalez plugged in the cord. *Brown Dep.* at 52. But, as Gonzalez points out, there is also evidence in the record that the cart was already in place at the time Gonzalez arrived, and that Brown and Lee were almost finished serving food by then. *Brown Dep.* at 48-53. This, Gonzalez argues, suggests that the Burlodge Cart was already in use. *Opp.* at 21.

## DISCUSSION

### I.  *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Though the movant bears the burden of showing that there is no genuine issue of material fact, this burden is "discharged by showing—that is by pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Ce-*

5

*lotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Should the movant carry its burden, the burden then shifts to the non-moving party to provide evidence establishing a question of fact. *See Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

  II.  *Negligence Claim*

Gonzalez's theory of liability is common law negligence. Under New York law, which governs this case, a plaintiff must demonstrate (i) the existence of a duty of care owed by the defendant to the plaintiff; (ii) breach of that duty; (iii) damages or injury proximately caused by the defendant's breach. *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998); *Solomon v. City of New York*, 66 N.Y.2d 1026 (1985).

  A.  Duty

"[A] threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contrs.*, 98 N.Y.2d 136, 138 (2002). The existence and scope of a duty running from the defendant to the plaintiff is a question of law. *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994). Aramark contends that if any duty was owed to Gonzalez, it was owed by Lutheran.

Because Aramark owes no general duty to keep Gonzalez safe from tripping hazards, any duty they may have had arose from Aramark's food services contract with Lutheran. Under New York law, "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." *Espinal*, 98 N.Y.2d at 138. In *Espinal v. Melville Snow Contractors*, the

6

Court of Appeals identified three circumstances under which a tort duty to third parties may arise out of a contractual assumption of responsibilities:

> "[A] party who enters into a contract to render services may be said to have assumed a duty of care . . . to third persons: (1) where the contracting party, in failing to exercise reasonable care in the performance of his duties, launche[s] a force or instrument of harm; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties; and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely."[1] *Id.* at 140.

The perimeters of these duties roughly correspond to the Court of Appeals's holdings in *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160 (1928), *Eaves Brooks Costume Co. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220 (1990), and *Palka v. Servicemaster Mgt. Servs. Corp.*, 83 N.Y.2d 579 (1994). Taking all facts and inferences in the light most favorable to Gonzalez, as the Court must, Gonzalez has established that Aramark owed her a duty under *Espinal*.

The first basis for this duty is *Espinal*'s statement that a defendant who "undertakes to render services and then negligently creates or exacerbates a dangerous condition may be liable for any resulting injury." 98 N.Y.2d at 141-42. Aramark does not appear to dispute that a Burlodge Cart positioned with a power cord extended across the floor is a dangerous condition. Instead, it argues that (a) because Gonzalez was the one to plug the Burlodge Cart in, and (b) because Aramark provided adequate training on the proper position of the carts, "there is no evidence that Aramark made the Hospital less safe through the performance of its managerial services." *Mot.* at 8.

This would be a compelling argument if it were a fair reading of the record, but it is not. To begin with, who positioned the cart and plugged in the cord is disputed. Drawing all inferences in favor of Gonzalez, the evidence suggests that the cord was already plugged in when she arrived at 4C/4D. And even if she did plug it in, the nature, frequency, and correctness of the

---

[1] As *Espinal* notes, these principles are essentially identical to those in the Restatement (Second) of Torts § 324A.

7

training and supervision Gonzalez received are also disputed. Although Aramark takes a narrow view of what the food services contract required of it, most of the record evidence of actual practice suggests that Aramark, not Lutheran, was responsible for training food services employees on the use of Burlodge Carts. *See Haynes Dep.* at 94-101 (explaining training procedures and precautions); *Mot.* exhs. H, I (sign-in sheets for Aramark safety training sessions); *Opp.* exhs. 4, 5 (Aramark training policies and modules for use at Lutheran). And a reasonable jury could find that Aramark's training and supervision were deficient, rendering Aramark's claim that it did not "ma[k]e the hospital less safe" inaccurate.

Aramark attempts to overcome this problem by arguing that its wrong was "at most a refusal to become an instrument of good," *Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 168 (1928). *Reply* at 7. It is true that the case law in this area sometimes recognizes the often blurry line between misfeasance and nonfeasance. *See, e.g.*, *Church ex rel. Smith v. Calanan Indus., Inc.*, 99 N.Y.2d 104, 112 (2002) (failure to install highway guardrail omitted to make highway safer but did not affirmatively make highway less safe). But in *Moch Company v. Rensselaer Water Company*, the case from which *Espinal* drew the "force or instrument of harm" duty, Chief Judge Cardozo explained that "[i]f conduct has gone forward to such a stage that inaction would commonly result, not negatively in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward." *Moch*, 247 N.Y. at 167. And in *Eaves Brooks*, the Court of Appeals explicitly rejected a mode of analysis based purely on the distinction between misfeasance and nonfeasance. 76 N.Y.2d at 226.

Here, the jury could find that Aramark selected the Burlodge Carts for use on the floors; developed or was responsible for developing procedures concerning use of those carts; and either gave incorrect instructions, failed to give sufficient training, or failed to establish a sound proce-

8

dure concerning the positioning of the carts, even though it knew the carts were routinely positioned improperly. Gonzalez's theory that this alleged negligence created a dangerous condition for food services employees is sound. *Cf. In re Air Crash*, 2010 WL 5185106, *8 (W.D.N.Y. 2010) (recognizing that deficient training can launch a force or instrument of harm). When viewed in the light most favorable to Gonzalez, the evidence establishes that Aramark owed Gonzalez a duty to take reasonable steps—through training, supervision, and safety procedures—to avoid the risks inherent in using Burlodge Carts.[2]

Gonzalez has also established that Aramark owed her a tort duty on the theory recognized in *Palka v. Servicemaster Management*, a holding adopted by *Espinal*. In *Palka*, the plaintiff, a nurse employed by Ellis Hospital, was injured when a wall-mounted fan fell on her. 83 N.Y.2d at 582. Defendant in that case was Servicemaster, an independent contractor that had contracted with the hospital two years before the accident to "train, manage and direct" certain services, including the maintenance department. *Id.* Plaintiff sought to hold Servicemaster liable for failing to inspect and maintain the wall-mounted fan that injured her.

Servicemaster first argued that its contract with the hospital did not require it to inspect and maintain the fan. The Court disagreed, relying on testimony to the effect that "preventative maintenance and casualty control prevention" were indeed understood to be part of Servicemaster's duties. *Id.* at 584. The Court held that the agreement between Servicemaster and the hospital "displaced entirely the hospital's prior in-house maintenance program and substituted an ex-

---

[2] Aramark seeks to vitiate any training or supervisory duty surrounding the Burlodge Carts by establishing that "serving food is a task so ordinary and within the ken of the average person that there is no duty to provide instruction, warnings and/or assistance in how to perform it." *Reply* at 10. Aramark is right that there is no duty under New York law to train employees in certain common and ordinary activities. *See, e.g.*, *Hernandez v. Board of Educ.*, 694 N.Y.S.2d 752, 754 (2d Dep't 1999); *Viskovic v. ENK Enters.*, 723 N.Y.S.2d 518, 518 (2d Dep't 2001). But Gonzalez does not seek to hold Aramark liable for failing to train her to walk while carrying tea. Her theory is that she was injured because Aramark failed in its supervisory duty to develop, implement, and monitor a safe and efficient food safety operation, including procedures to avoid unreasonable tripping hazards created by the equipment it selects for that task. Configuring food service equipment in a hospital is not a common and ordinary activity. That is why, according to Aramark, supervisors train food service employees on how it should be done.

9

clusive responsibility in Servicemaster to perform all of Ellis Hospital's pertinent, nonmedical, preventative, safety inspection and repair service functions." *Id.*

Having found that Servicemaster was contractually obligated to inspect and maintain the fan, the Court proceeded to address whether Servicemaster owed a duty in tort to the injured plaintiff. The Court found that it did. It began by noting the "comprehensive and exclusive" contract in *Palka*, distinguishing it from the "limited contractual obligation" that the Court of Appeals in *Eaves Brooks* had held did not give rise to a tort duty. *Id.* at 588. Moreover, the policy considerations that were part of the Court of Appeals' reasoning in *Eaves Brooks*—"the plaintiff's right to seek damages directly from the building's owners; the building's owners being in a better position to insure against any property loss in the building; and the limited scope of defendant's undertaking reflected in the minimum annual fee arrangement"—were absent from *Palka*. In their place was an "array of factors" giving rise to a duty: "reasonably interconnected and anticipated relationships, particularity of assumed responsibility under the contract and evidence adduced at trial, displacement and substitution of a particular safety function designed to protect persons like this plaintiff, and a set of reasonable expectations of all the parties." *Palka*, 83 N.Y.2d at 589.

In essence, *Palka* recognizes that a duty exists when, as a result of a contract, one party fully assumes the other's responsibilities in a specific, articulable sphere to a reasonably predictable, identifiable class of individuals. Aramark again relies on its narrow view of the food services contract to foreclose its duty under *Palka*. Aramark argues that its only role under the contract was "management and supervision of Lutheran's food service employees." *Mot.* at 10. It points to a term in the contract providing that Lutheran "shall furnish building maintenance services for the Food Service Facilities." *Id.* It further argues that (a) Lutheran employed safety officers like

10

Thomas Delucia and Bill Killips; (b) that those officers performed safety rounds; and (c) that Lutheran purchased the Burlodge Carts. *Mot.* at 10-12. Accordingly, Aramark concludes, it did not displace Lutheran's duty towards Gonzalez, a Lutheran employee.

This evidence is certainly relevant, but it is not dispositive. To begin with, Aramark's view of the limited scope of the food services contract is belied by terms in the contract itself. It is true that workers like Gonzalez were formally employed by Lutheran, but the contract also contemplates that some number of Lutheran employees would be assigned to the food services department Aramark ran. *Mot.* exh. F at 5. It is also true that Lutheran purchased the Burlodge Carts, but that is because Aramark selected them and because the contract required Lutheran to provide "completely equipped" food services facilities. *Mot.* exh. F. at 2; *Davis Dep.* at 10; 35-39. Indeed, the contract's terms—Aramark's right to hire its own supervisors, Lutheran's agreement to provide office space, Aramark's obligation to develop an "Employee Skills Training Plan"—comprehensively provide everything Aramark would need to assume full control over food services operations.

In addition, there exist genuine issues of material fact concerning the performance of the food services contract. It is, of course, undisputed that when Lutheran contracted with Aramark to handle food services operations, it did not completely disband all other safety operations in the hospital. But there is evidence suggesting that both Lutheran supervisors and food services employees understood the performance and safety of food services operations to be Aramark's realm. Thomas Delucia, a hospital safety supervisor, stated that although his department was concerned with tripping hazards in the hospital generally, monitoring food services minutiae like the positioning of the Burlodge Carts was Aramark's responsibility. *Delucia Dep.* at 12-14; 34. Similarly, Myles Davis, the Senior Vice President of Corporate Services at Lutheran, testified

that Aramark was "generally" and "primarily" responsible for the supervision of food services operations. *Davis Dep.* at 16-20. And this is certainly how the food services employees understood the arrangement. Gonzalez, Brown, and Lee viewed Aramark supervisors as their bosses. In their depositions they routinely refer to either Alicia Haynes or Christine Uiterwyk (the Food and Nutrition Director and an Aramark Employee) as their supervisors, and appeared to have no idea who Myles Davis, Thomas Delucia, or Bill Killips are. *See Gonzalez Dep.* at 139-40; *Brown Dep.* at 27, 60-61; *Lee Dep.* at 24-25.

When taken in the light most favorable to Gonzalez, the evidence gives rise to a duty under *Espinal* and *Palka*. The food services contract was not the sort of limited, periodic, or off-site engagement that does not displace a set of common-law duties. *Cf. Sage Enterps.*, 1996 WL 1057144 (off-site alarm monitoring contract did not absorb warehouse owner's duty to maintain premises); *Espinal*, 98 N.Y.2d at 141 (plowing contract did not displace landowner duties); *Occhino v. Citigroup Inc.*, 2005 WL 2076588, *8 (E.D.N.Y. 2005) (maintenance contract did not displace owner's duty to maintain premises). Aramark fully supplanted Lutheran's food services department. It developed detailed food services procedures and implemented them on-site, every day. It was responsible for training, managing, and assigning all food services personnel. Certainly it was in the best position to prevent hazards arising from food services equipment like Burlodge Carts. And Gonzalez, who took her directions from Aramark,[3] looked to and relied upon Aramark to do just this.

In *Palka*'s terms, the relationship between Gonzalez and Aramark was "reasonably interconnected and anticipated"; the sphere for which Aramark was responsible at the hospital was defined and particular; at least some evidence shows that preventing hazards specific to food ser-

---

[3] The Court notes here that despite the many markings of a master-servant relationship between Aramark and Gonzalez, Aramark has explicitly argued that it is not Gonzalez's special employer under New York state workers' compensation laws. O/A at 11-12. *See generally Cipollone, et al v. Aramark Healthcare Support Servs., et al*, 10-cv-175, slip op., D.E. # 44.

vices equipment like the Burlodge Carts was Aramark's responsibility; and food services employees like Gonzalez had an actual and reasonable expectation that Aramark would discharge this responsibility. This gives rise to a duty.

In sum, the Court finds that taking all facts and inferences in the light most favorable to Gonzalez, she has established that Aramark owed her a duty under *Espinal*. The Court notes in conclusion that finding a duty running from Aramark to Gonzalez in this case in no way extends potential tort liability to "an indefinite number of potential beneficiaries." *Moch*, 247 N.Y. at 160. Moreover, the scope of Aramark's duty hews closely to Chief Judge Cardozo's familiar maxim that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation." *Palsgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 344 (1928); *see also Tagle v. Jakob*, 97 N.Y.2d 165, 168 (2001) ("The scope of any such duty of care varies with the foreseeability of the possible harm."). It is not unreasonable for Gonzalez and those similarly situated to expect Aramark to use ordinary care and skill. Nor is it unduly burdensome to require Aramark to meet this standard.

*B. Breach of Duty*

Aramark next contends that even if it did owe Gonzalez a duty, Gonzalez cannot establish that it breached that duty. To establish breach of duty in a trip-and-fall case, "it is well settled as a matter of New York law that . . . a plaintiff must show that the defendant either created a dangerous condition, or had actual or constructive notice of a dangerous condition." *Samuels v. Marriott Intern, Inc.*, 86 F. App'x 453, 455 (2d Cir. 2004). "Whether a defendant created or had notice of a hazardous condition is a question of fact." *DeAngelis v. Am. Airlines, Inc.*, 2010 WL 1292349, *3 (E.D.N.Y. 2010). Aramark argues that Gonzalez has not provided any evidence to satisfy this standard.

Aramark first contends that no genuine issue of material fact exists as to whether it created the tripping hazard that caused Gonzalez's fall. It contends that it was Gonzalez who, disregarding Aramark's training, improperly situated and plugged in the cart. *Mot.* at 8. But the Court has already found factual disputes concerning who plugged in the cart, and whether food services employees were properly trained in the positioning and use of the Burlodge Carts. *See* Section II.A, *supra*.

Moreover, there is evidence in the record that would support constructive notice. "A defendant who has actual knowledge of a recurring dangerous condition can be charged with constructive notice of each specific reoccurrence of that condition." *Fielding v. Rachlin Mgmt. Corp.*, 766 N.Y.S.2d 381, 382 (2d Dep't 2003). Aramark was well-aware that an improperly parked Burlodge Cart could create a tripping hazard. *Haynes Dep.* at 89. Aramark claims to have trained food services employees to avoid this. *Id.* at 89-100. Brown, one such employee, testified that in spite of any training, Burlodge Carts were routinely parked incorrectly, and that he himself had tripped over the cord on several occasions. *Brown Dep.* at 27. He further testified that he had informed Aramark supervisors, including Haynes, of this problem. *Id. at* 60-61. Taking all this as true, Aramark had actual knowledge of a recurring hazard, so it is charged with knowledge of the specific hazard that injured Gonzalez.

Aramark's last attempt to win Summary Judgment is its argument that the cord that tripped Gonzalez was the sort of "open and obvious" hazard against which a responsible party has no duty to protect passersby. *Mot.* at 20-21; *see Tagle*, 97 N.Y.2d at 169. Although such a conclusion is sometimes appropriate for summary judgment, the issue is "generally fact-specific and thus usually a jury question." *Id.* In this case, the question will turn on who plugged the cord in, how frequently and how recently Gonzalez had observed the food services configuration on the

floors, and other highly contextual factors that could obscure a potential hazard. These facts are disputed. And, in any event, "the fact that the alleged hazardous condition . . . was open and obvious does not preclude a finding of liability against it for its failure to maintain its premises in a reasonably safe condition, but rather, raises an issue of fact concerning the plaintiff's comparative fault." *Mei Xiao Guo v. Quong Big Realty Corp.*, 81 N.Y.S.2d 155, 156 (2d Dep't 2011). The Court thus declines to award Summary Judgment on this basis.

## CONCLUSION

For the above reasons, Aramark's Motion for Summary Judgment is denied.

SO ORDERED.

Dated: Brooklyn, N.Y.
      March 26, 2012

                                                      /s/
                                        Carol Bagley Amon
                                        Chief United States District Judge